**LAWRENCE G. WASDEN**
ATTORNEY GENERAL OF IDAHO

**MARK A. KUBINSKI, ISB #5275**
Lead Deputy Attorney General
Idaho Department of Correction

**EMILY A. MAC MASTER, ISB #6449**
Deputy Attorney General
Idaho Department of Correction
1299 North Orchard St., Suite 110
Boise, Idaho 83706
Telephone (208) 658-2098
Facsimile (208) 327-7485
E-mail:  mkubinsk@idoc.idaho.gov
E-mail: emacmast@idoc.idaho.gov

Attorneys for Defendants Timothy McKay, Amanda Gentry, and Jay Christensen

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF IDAHO

|  |  |
|---|---|
| JODY CARR,<br><br>                              Plaintiff,<br><br>vs.<br><br>DEPUTY WARDEN MCKAY, GENTRY,<br>AND CHRISTENSEN,<br><br>                              Defendants. | **Case No. 1:20-cv-00314-DCN**<br><br>**DEFENDANTS' *MARTINEZ* REPORT** |

Defendants Timothy McKay, Jay Christensen and Amanda Gentry (collectively, the "Defendants"), by and through their attorneys of record, the State of Idaho Office of Attorney General, hereby make a limited appearance to submit this *Martinez Report* and, in support hereof, the declarations of Warden Jay Christensen and Deputy Warden Sue Wessels.

**DEFENDANTS' *MARTINEZ* REPORT**                                                          1

## I.     INTRODUCTION

Under the Prison Litigation Reform Act (PLRA):  "The Court retains screening authority to dismiss claims at any time during the litigation under § 1915A" and "has the authority to seek additional information from the parties to assess Plaintiff's claims during the screening process," including by requesting a *Martinez* report.  *See Ritter v. Reinke,* 2015 WL 2034180, *2 (D. Idaho 2015) (unpublished) (citing *Martinez v. Aaron,* 570 F.2d 317, 319 (10th Cir. 1978)).

This lawsuit appears to be one of multiple actions that *pro se* plaintiff Jody Carr (Carr) hopes to proceed on under the PLRA.  On January 5, 2021, Sergeant Adam Miller of the Idaho Department of Correction (IDOC) made a limited appearance in *Carr v. Miller,* Case No. 1:20-cv-00314-DCN, to file a *Martinez* report as ordered by this Court. In support, on January 6, 2021 Sgt. Miller lodged two declarations and exhibits under seal for a confidential *in camera* review by the Court.  This present action has facts in common with the *Carr v. Miller* lawsuit and is the second case in which this Court has requested a *Martinez* report.

In this lawsuit, Carr alleges he was deprived due process in regard to three housing assignments while in the custody of IDOC. As summarized in the *Successive Review Order* at Docket 4, Carr alleges he was denied due process when: (1) Deputy Warden Tim McKay allegedly transferred Carr from close custody to administrative segregation on July 17, 2019 with no notice of charges or a meaningful opportunity to be heard; (2) Deputy Chief of Prisons Amanda Gentry allegedly kept him in administrative segregation with no hearing; and (3) Warden Jay Christensen and Deputy Warden McKay allegedly left him in administrative segregation a third time with no hearing. (Dkt. 4, p. 5.)

In the *Successive Review Order,* the Court finds that "it would be helpful to the screening process for the Idaho Department of Correction to provide via a Martinez report additional

information about conditions of confinement existing in the different types of segregation associated with Plaintiff's three claims above, what process was provided to Plaintiff, how long he was in segregation for each of the three instances, and any other relevant information for the Court to use to conduct screening regarding Plaintiff's asserted liberty interest and due process claims. The Court orders: "Counsel for Defendants are requested to make a limited appearance for the purpose of providing a Martinez report and any other relevant records."  (Dkt. 4, pp. 6–7.)

Pursuant to the *Successive Review Order*, the Defendants submit this *Martinez* report.

## II.      SUMMARY OF FACTS

**A.      Background.**

All three defendants are employed by IDOC in the Division of Prisons.  Amanda Gentry is one of two Deputy Chiefs reporting to the Chief of the Division of Prisons.  Deputy Warden Gentry supervises IDOC's prison wardens, including but not limited to the wardens of the Idaho State Correctional Center (ISCC) and the Idaho Maximum Security Institution (IMSI).  Jay Christensen is the ISCC Warden, and he reports to Deputy Chief Gentry.  Tim McKay is the Deputy Warden of Operations at ISCC, and he reports to Warden Christensen.  (*Declaration of Jay Christensen* ["*Christensen Decl.*"]*,* filed herewith, ¶ 2.)

Carr has been in IDOC's custody since in or about 2005, and he is not eligible for parole consideration until 2029.  As this Court has recognized, Carr has been granted protective custody for years.  *See Carr v. Higgins,* 2014 WL 4411238, **11–13 (D. Idaho 2014), *aff'd in part and rev. in part,* 700 Fed.Appx. 598 (9th Cir. 2017) (addressing Carr's prior protective custody status).

Protective custody separates an inmate from the general prison population for that inmate's own safety.  There are two levels of protective custody confinement.  Level One protective custody provides the highest security and necessarily is more restrictive.  Level Two protective custody

**DEFENDANTS' *MARTINEZ* REPORT**                                                      3

provides a structured transition period for inmates preparing to reintegrate with the general population, or a less restrictive environment for inmates who do not require the security of Level One protective custody.  (*Id.,* ¶¶ 5–8 and Exhibits A and D thereto.)

ISCC is the only facility in the IDOC prison complex south of Boise, Idaho that houses male protective custody inmates, and its protective custody beds are limited. Protective custody is located on two tiers in D Block.  Tier D1 houses Level One protective custody inmates, while Tier  D2 houses Level Two protective custody inmates. (*Id.,*  ¶¶ 5–9 and Exhibits A and D thereto.)

**B.     Purposes of Restrictive Housing.**

Restrictive housing allows IDOC to separate inmates from the general population to ensure the safety and security of inmates, staff, and IDOC prison operations.  Short-term restrictive housing is used for pre-hearing segregation, segregation pending investigation, transit, and disciplinary detention.  Long-term restrictive housing, for administrative segregation, is used for inmates who pose a threat to life, property, self, staff or other inmates, or when their continued presence threatens the secure and orderly operation of the facility.  (*Christensen Decl.*, ¶¶ 3–4 and Exhibits A–C thereto.)

**C.     Carr's Housing Assignments in 2019.**

Mr. Carr was moved to housing on Tier D2 in D Block on or about August 16, 2018.  (*Id.,* ¶¶ 10–11 and Exhibit E thereto.)  On or about April 8, 2019, ISCC moved Carr from Tier D2 to Tier D1, when it was necessary to separate him from another protective custody inmate.  Around this same time, Carr alleged that the other inmate had sexually assaulted him twice.  This complaint was referred to the Ada County Sheriff's Office (ACSO) to investigate.  (*Id.,* ¶¶ 12–14.)

On or about June 12, 2019, due to new allegations of misconduct by Carr on Tier D1, ISCC placed him in short-term restrictive housing, for segregation pending an investigation.  Following

**DEFENDANTS' *MARTINEZ* REPORT**                                                                 4

a restrictive housing hearing on or about July 18, 2019, Carr was referred to administrative segregation in long-term restrictive housing.  (*Id.,* ¶¶ 15–19 and <u>Exhibits F–J</u>.)

On or about July 26, 2019, Carr was transferred to IMSI for placement in administrative segregation in long-term restrictive housing. Mr. Carr remained in administrative segregation at IMSI until he was released from this long-term restrictive housing and then returned to protective custody housing at ISCC on or about August 27,  2019.  (*Id.,* ¶¶ 20–21 and <u>Exhibit E</u>.)  Since returning to ISCC on or about August 27, 2019, Carr  has been housed in his prior Level One protective custody on Tier D1 in D Block. (Id., ¶ 21 and <u>Exhibit K</u>.)

## III.    REPORT TO THE COURT

### A.    The Legal Standard for Showing a Liberty Interest.

This Court has ordered the defendants to provide "prison records and officials' description of what the conditions of confinement are in each instance" of housing at issue and "how long Plaintiff was held in each instance." (Dkt. 4, p. 5.)  In the *Successive Review Order,* the Court described the standard for implicating a liberty interest in conditions of confinement, as follows:

> "Liberty interests created by state law or prison regulations that entitle an inmate to due process are "generally limited to freedom from restraint." *Sandin v. Conner*, 515 U.S. [472,] 484 (1995). (internal citations omitted). A liberty interest arises only if the conditions of confinement impose an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin*, 515 U.S. at 484.
>
> To determine whether the conditions of confinement pose an atypical and significant hardship, courts must conduct a "case by case, fact by fact" analysis of the "condition or combination of conditions or factors" that the plaintiff experienced. *Serrano*, 345 F3d. [1071,] 1078 [(9th Cir. 2003)] (citing *Keenan v. Hall*, 83 F.3d 1083, 1089 (9th Cir.1996)). That analysis includes: (1) if disciplinary, whether that condition was essentially the same as conditions in other forms of segregation, such as administrative segregation; (2) whether a comparison between the plaintiff's confinement and conditions in the general population showed that the plaintiff suffered no "major disruption in his environment"; and (3) whether the length of the plaintiff's sentence was affected. *Sandin*, 515 U.S. at 486-87; *see also Resnick v. Hayes*, 213 F.3d 443, 448 (9th Cir. 2000) (clarifying that, to prevail, a prisoner must establish a liberty interest, showing "that his confinement, whether administrative

or disciplinary, presented "the type of atypical, significant deprivation [that] might conceivably create a liberty interest" (emphasis added)).

(*Id.* at pp. 4–5.).

As discussed below and shown in the declarations and evidence submitted herewith, Carr has not alleged a liberty interest at stake based upon conditions of confinement at ISCC or IMSI that rises to the level of an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life," as required by *Sandin* to proceed in this action.

**B.    The Housing Under Review: (1) Short-Term Restrictive Housing and (2) Administrative Segregation in Long-Term Restrictive Housing.**

Carr's use of prison slang—e.g., allegedly being "thrown in the hole"—does nothing but create confusion. While the *Successive Review Order* references segregation and administrative segregation interchangeably, they are not interchangeable. (*See* Dkts. 3–4.)

Rather, "segregation pending investigation" is a form of short-term restrictive housing. "Administrative segregation" is different; it is long-term restrictive housing.   (*See Christensen Decl.,* ¶¶ 3–4 and Exhibits A–C thereto.)

On or about June 12, 2019, Carr was moved from Level One protective custody housing to short-term restrictive housing for a "segregation pending investigation." (*Id.,* ¶ 15 and Exhibit F thereto.)  On or about July 11, 2019, his housing status was changed to "long-term restrictive housing referral status" because his matter was referred to a restrictive housing hearing.  Carr received notice of this hearing.  (*Id.,* ¶ 18 and Exhibits I–J thereto.)

Following the hearing held before the ISCC Restrictive Housing Hearing Committee on or about July 17, 2019, Carr was approved for placement in long-term restrictive housing for "administrative segregation" and was moved to IMSI.  (*Id.,* ¶¶ 19–20 and Exhibit J thereto.) (On August 27, 2019, after IMSI released him from administrative segregation, Carr was returned to his prior protective custody housing on Tier D1 at ISCC.)

As requested by the Court, the conditions of confinement in these two types of restrictive housing—(1) short-term restrictive housing and (2) administrative segregation in long-term restrictive housing—are discussed below.

## C.     ISCC: Conditions of Confinement in Short-Term Restrictive Housing

Segregation pending investigation is "[a] temporary form of segregation that is used for investigative purposes and to separate offenders from the general population so that the integrity of an investigation is not compromised." (*Christensen Decl.,* Exhibit A thereto, p. 2.)

Carr was placed in segregation pending investigation in short-term restrictive housing from on or about June  14, 2019 through on or about July 11, 2019.  (*Id.,* ¶¶ 15–17 and Exhibits F–H thereto.)  On or about July 11, 2019, his housing status was changed to "long-term restrictive housing referral status" pending his restrictive housing hearing, which was held on July 17, 2019. (*Id.,* ¶¶  18–19 and Exhibits I–J thereto.)

The conditions of confinement for short-term restrictive housing at ISCC are described in the *Declaration of Jay Christensen,* filed herewith, at paragraphs 22–36, and in the Standard Operating Procedures and ISCC Field Memorandum attached as Exhibits A–C thereto.

As demonstrated in Mr. Christensen's declaration and the exhibits thereto, the conditions of confinement in short-term restrictive housing at ISCC do not constitute an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." Under the first prong of *Sandin*, they are essentially the same as the conditions of confinement in long-term administrative segregation.  (*See id.*, ¶¶ 22–36 and Exhibits A–C thereto; *Declaration of Sue Wessels* [*"Wessels Decl."*], filed herewith, ¶¶ 1–20 and Exhibits A–C thereto.)  Under the second prong of *Sandin*, the conditions did not constitute a major disruption in Carr's already restricted

environment in Level One protective custody. In fact, there are several similarities with the conditions of confinement in protective custody. Protective custody separates an inmate from the general prison population for his own safety. For this reason, it has more restrictions than housing for the general population. (*Id.,* ¶¶ 22–36 and Exhibits A and D thereto.) Under the third prong of *Sandin,* there are no allegations or evidence that this short restriction in the summer of 2019 affected the length of Carr's sentence. Instead, he remains eligible for parole consideration in 2029.

In sum, the conditions of Carr's confinement in short-term restrictive housing in June and July 2019 do not warrant allowing a due process lawsuit to proceed against the defendants.

**D.    IMSI: Conditions of Confinement in Long-Term Administrative Segregation.**

Carr was housed in administrative segregation in long-term restrictive housing at IMSI from on or about July 26, 2019 through on or about August 27, 2019. The conditions of confinement for administrative segregation at IMSI are described in the *Declaration of Sue Wessels,* at paragraphs 1 through 20, and in the IMSI Field Memoranda at Exhibits A–C thereto.

As shown therein and discussed above, under the first prong of *Sandin*, the conditions in administrative segregation are very similar to the conditions in short-term administrative segregation. (*See id.*, ¶¶ 1–20 and Exhibits A–C thereto; *Christensen Decl.,* ¶¶ 22–36 and Exhibits A–C thereto.) Under the second prong of *Sandin*, the conditions did not constitute a major disruption in Carr's already restricted environment in protective custody. Instead, many of the conditions of confinement in administrative segregation are similar to if not the same as the conditions of confinement in protective custody housing. (*See id.*) Under the third prong of *Sandin,* there are no allegations or evidence that Carr's one-month administrative segregation at IMSI affected the length of his sentence. Carr's conditions of confinement at IMSI did not implicate a liberty interest under the threshold requirements of *Sandin.* The IMSI conditions do not warrant allowing Carr to proceed in a due process lawsuit against any of the defendants.

**DEFENDANTS' *MARTINEZ* REPORT**                                                    8

**E.      Information Concerning Restrictive Housing Hearings.**

As described in the declarations of Warden Christensen and Deputy Warden Wessels, Carr received notice and a hearing before the ISCC Restrictive Housing Hearing Committee on or about July 17, 2019, and he received a second hearing before the IMSI Restrictive Housing Hearing Committee on or about August 13, 2019.  (*See Christensen Decl.,* ¶¶ 19, 21 and Exhibits J–K thereto; *Wessels Decl.,* ¶ 5.)  If the Court requires further information regarding the reasons for the hearings and/or the Committee decisions, Defendants are prepared to file additional highly confidential documents under seal for a strictly confidential *in camera* review.  However, without confidentiality assured by the Court's direction (as in the *Carr v. Miller* lawsuit), the risk of their disclosure in this lawsuit would pose a jeopardy to safety and security in IDOC prisons.

## IV.      CONCLUSION

This report is submitted by the Defendants in a limited appearance only and without waiver of any defenses or claims that they may have against Carr in this or any other action.

For the reasons discussed above, the conditions of confinement in Carr's short-lived restrictive housing placements from June through August 2019 do not implicate a liberty interest under *Sandin* as required for a due process lawsuit to proceed.  For this reason, this lawsuit should be dismissed in its entirety, with prejudice.

Respectfully submitted this 29thday of January, 2021.

By:      /s/ Emily A. Mac Master
      EMILY MAC MASTER
      Deputy Attorney General
      *Counsel for Defendants Timothy McKay,*
      *Amanda Gentry, and Jay Christensen*

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on the 29th day of January, I caused to be served a true and correct copy of the foregoing by the following method to:

| | | |
|---|---|---|
| Jody Carr | __X__ | U.S. Mail, Postage Prepaid/Prison Mail |
| IDOC #79004 | _____ | Overnight Mail |
| ISCC | _____ | Hand Delivery |
| 14601 S. Pleasant Valley Rd. | _____ | Facsimile |
| P.O. Box 70010 | _____ | ECF |
| Kuna, Idaho 83634 | | |
| *Plaintiff* | | |

_____/s/ Emily A. Mac Master_____
Emily A. Mac Master
Deputy Attorney General

**DEFENDANTS' *MARTINEZ* REPORT**                                                                                  10