UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| JODY CARR,<br><br>                    Plaintiff,<br><br>v.<br><br>DEPUTY WARDEN McKAY,<br>GENTRY, and CHRISTENSEN,<br><br>                    Defendants. | Case No. 1:20-cv-00314-DCN<br><br>**MEMORANDUM DECISION<br>AND ORDER** |

The conditions of confinement claims remaining for adjudication in Plaintiff Jody Carr's prisoner civil rights case are very narrow:  Claim 3, due process (August 27, 2019, through September 22, 2021); Claim 4, cruel and unusual punishment (August 27, 2019, through July 19, 2021); and Claim 5, due process (May 1, 2019 and July 31, 2019).

Plaintiff's Motion for Partial Summary Judgment (Dkt. 79) and Defendants' Cross-Motion for Summary Judgment (Dkt. 83) are now briefed and ripe for adjudication. For the following reasons, the Court will grant Defendants' Cross-Motion for Summary Judgment and deny Plaintiff's Motion for Summary Judgment.

### PRELIMINARY MOTIONS

Plaintiff has filed a Motion to Submit/Resubmit Exhibits. Dkt. 80. The Court earlier ordered the parties to refer to exhibits already in the record rather than refile them. Plaintiff asserts that he has many prison barriers to following the Court's prior instruction and

cannot refer to exhibits already in the record but must resubmit them in support of his new motion. The Court will grant Plaintiff's motion to prevent waste of additional public resources attendant with requiring Plaintiff to resubmit his filings.

Defendants request that the Court seal certain exhibits that pose a security or confidentiality risk. Dkt. 84. These documents were sealed in the original federal court cases in which they were first proffered, Case 1:20-cv-00315-DCN, *Carr v. Miller* ("Case 315"), and the same protective reasons exist here. *See* Dkt. 20 in Case 315; Dkt. 84-4 at 7 in this case (sealed). Good cause appearing, the motion will be granted, and any records referred to from Plaintiff's other cases that are sealed will remain sealed here.

## REVIEW OF THE PARTIES' SUMMARY JUDGMENT MOTIONS

### 1. Standards of Law for Summary Judgment

Summary judgment is appropriate where a party can show that, as to a claim or defense, "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Material facts are those "that might affect the outcome of the suit." *Id.* at 248. "Disputes over irrelevant or unnecessary facts will not preclude a grant of summary judgment." *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).

To show that a material fact is not in dispute, a party may cite to particular parts of the record or show that the adverse party is unable to produce admissible evidence to support the fact. Fed. R. Civ. P. 56(c)(1)(A) & (B). The Court must consider "the cited materials," but it may also consider "other materials in the record." Fed. R. Civ. P. 56(c)(3).

The Court does not determine the credibility of affiants or weigh the evidence set

MEMORANDUM DECISION AND ORDER - 2

forth by the parties. Although all reasonable inferences which can be drawn from the evidence must be drawn in a light most favorable to the non-moving party, *T.W. Elec. Serv., Inc.*, 809 F.2d at 630-31, the Court is not required to adopt unreasonable inferences from circumstantial evidence, *McLaughlin v. Liu*, 849 F.2d 1205, 1208 (9th Cir. 1988).

Pro se inmates are exempted "from *strict* compliance with the summary judgment rules," but not "from *all* compliance." *Soto v. Sweetman*, 882 F.3d 865, 872 (9th Cir. 2018). At summary judgment, courts "do not focus on the admissibility of the evidence's form," but "on the admissibility of its contents." *Fraser v. Goodale*, 342 F.3d 1032, 1036 (9th Cir. 2003).

"If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact," the Court may "give an opportunity to properly support or address the fact," "defer considering the motion nor deny it," or "issue any other appropriate order." Fed. R. Civ. P. 56(d)-(e).

## 2. Discussion of Claim 3

The courts historically concluded that due process rights attach to disciplinary segregation, and then extended those rights to some forms of administrative segregation. *See Resnick v. Hayes*, 213 F.3d 443, 444 (9th Cir. 2000) (holding that the plaintiff failed to establish a liberty interest, having failed to allege "that his confinement, *whether administrative or disciplinary*, presented "the type of atypical, significant deprivation [that] might conceivably create a liberty interest." More recently, courts have emphasized that it is not the designation or name given to the housing at issue, but the conditions, that determine which due process protections, if any, are warranted. To determine whether

segregation poses an atypical and significant hardship, courts must conduct a "case by case, fact by fact" analysis of the "condition or combination of conditions or factors" that the plaintiff experienced. *Serrano v. Francis*, 345 F.3d 1071, 1078 (9th Cir. 2003) (citing *Keenan v. Hall*, 83 F.3d 1083, 1089 (9th Cir. 1996)).

In Claim 3, Plaintiff alleges, from August 27, 2019, through September 22, 2021, Defendants violated Plaintiff's due process rights by leaving him in very restrictive housing, Close Custody/Protective Custody ("CC/PC") Unit, Walk D1 (single cell housing), that had even fewer privileges than the prison's designated administrative segregation housing. As a result, he argues, he qualified for formal due process regarding his placement and retention there because posed an "atypical and significant" hardship when compared to general prison conditions. *See Sandin v. Conner*, 515 U.S. 472, 484 (1995). Avoiding atypical and significant hardships in prison is a "liberty interest" that requires the minimum due process protections. *Id*. at 477-486.

For the sake of argument, the Court assumes that Plaintiff had a liberty interest in not being housed in an isolation cell for a little over six months. The remainder of his time in the isolation unit was during the COVID19 pandemic and is addressed more fully in a different section of this Order.

A. ***Defendants' Argument that Plaintiff Received All the Process He was Due at Initial Placement***

Current case law distinguishes between lesser due process protections required for *initially* placing inmates in administrative segregation and greater protections required for *continuing* to house inmates in administrative segregation. In this subsection, the Court

discusses *initial* placement, and in the next subsection it discusses *continuing* placement.

Within a reasonable time from *initial* placement in administrative segregation, prison officials must (1) hold an informal nonadversary hearing, (2) inform the prisoner of the charges against him or the reasons for considering segregation, and (3) allow the prisoner to present his views. *Toussaint v. McCarthy*, 801 F.2d 1080, 1100 (9th Cir. 1986), *overruled in part on other grounds by Sandin v. Conner*, 515 U.S. 472 (1995) (internal citations and footnote omitted). Initial-placement due process "does not require detailed written notice of charges, representation by counsel or counsel-substitute, an opportunity to present witnesses, or a written decision describing the reasons for placing the prisoner in administrative segregation." *Toussaint*, 801 F.2d at 1101.

On August 13, 2019, the Restrictive Housing Review Committee held a hearing with Plaintiff. Dkt. 80-3 at 19. The Committee recommended that he be released from administrative segregation—meaning a *prior not-at-issue* period of administrative segregation period that was adjudicated in *Carr v. Lytle*, Case No. 1:20-cv-00313-DCN ("Case 313"), 2024 WL 989697 (D. Idaho March 7, 2024).[1] The Committee noted: "Offender Carr was compliant throughout the Hearing[;] however, his responses appeared to lack specific information when questioned by DW Wessels. Carr reported he had no idea why he was transferred to IMSI [prior not-at-issue administrative segregation] and requested to return to D2 at ICC where he felt safe." *Id*.

---

[1] Plaintiff attempts to draw from his prior not-at-issue period of administrative segregation to support his separate claims in this case in his Statement of Undisputed Facts. Dkt. 79-4. Those "facts" are disregarded because they were adjudicated in a different case, Case 313.

It is also important to note that Plaintiff had lived in CC/PC for a lengthy time prior to his not-at-issue administration segregation placement, and, during this initial placement due process hearing, he was returned to his regular housing unit by the Committee. The only difference is that Plaintiff was placed on the single-celled Walk in CC/PC (D1), rather than D2, the double-celled Walk. On August 30, 2019, three days after his placement in D1, prison officials issued a memo to Plaintiff: "On August 13th, 2019, the Restrictive Housing Committee met for your Protective Custody Placement Hearing, and has recommended the following: The Headquarters Administrative Review Committee has reviewed the situation documents and have recommended Mr. Carr to be placed in Protective Custody." Dkt. 80-3 at 22.

The Court concludes the evidence in the record shows that, at his initial placement due process hearing, Plaintiff sought to be released from his prior not-at-issue administrative segregation, and sought to be placed in the CC/PC unit, where he normally was housed, because he felt safe in CC/PC. His desires were met by the placement at issue. Prison officials noted on the hearing summary document that the not-at-issue prior administrative segregation had also been for Plaintiff's safety, but he had complained he did not feel safe and wanted to return to CC/PC. Dkt. 80-3 at 19.

For the reasons the Court articulated in Case 313, "due process" at this initial stage does not require prison officials to reveal that placement in segregation is also for continuing investigative purposes, because nondisclosure preserves the integrity of ongoing investigations so that the investigations are not compromised. *See* 2024 WL 989697 at *6; *see also* Dkt. 80-3 at 17: ("I believe [Carr's] case to Ada County is still

ongoing and in attempt to filter out false allegations I would recommend his continued placement"). As the facts below show, various factors converged near the time of Plaintiff's initial placement in CC/PC D1 that show his placement in a single-cell environment in the unit of his choice was appropriate: investigations into Plaintiff's allegations that he had been harmed by other inmates were ongoing; investigations tended to show that Plaintiff had been harming other inmates' interests by manipulating them to Plaintiff's advantage; and court orders and other inmates revealed that Plaintiff was engaging in disruptive jailhouse lawyer activities. These factors are detailed below.

The Court concludes that prison officials provided Plaintiff with sufficient due process protections within a reasonable time of his initial placement in CC/PC Unit, D1. Plaintiff requested placement in protective custody housing for safety reasons, and was placed there. His placement in a single cell not only constituted the highest level of protection for him, but it also enabled prison officials to continue to investigate and determine how best to deal with the various factors that made Plaintiff a difficult inmate to house. Under all these circumstances, Plaintiff was not initially entitled to any more notice simply because he was placed in a single cell, not a double cell, or that he was isolated from other prisoners in the unit for what was to be an unknown time. Defendants are entitled to summary judgment on this subclaim of Claim 3.

## B. *Due Process After Initial Placement*

After initial placement in CC/PC D1, Plaintiff participated in weekly meetings about his conditions of confinement and housing with a designated point of contact prison official. *See* Dkt. 83, 4-5. That staff member documented Plaintiff's concerns. *Id*. During

these meetings, Plaintiff asked why he was on D1, and staff explained it was for his safety.

Dkt. 80-3 at 5. On October 1, 2019, the notes reflect: "Carr stated that everything is good

with him and he is happy where he is. Carr stated he feels safe where he is living." *Id*. at 4.

On October 29, 2019, the staff member recorded: "Carr [accepted] this for the time being

but has stated eventually he would like to be released." *Id*. at 5 (spelling corrected). The

meeting notes from November 2019 show no significant concerns. *Id*.

In *Hewitt v. Helms*, 459 U.S. 460 (1983), *overruled on other grounds by Sandin v.*

*Conner*, 515 U.S. 472 (1995), the Supreme Court gave instructions for administrative

segregation reviews for continuing placement in atypical housing, including the following:

> [A]dministrative segregation may not be used as a pretext for
> indefinite confinement of an inmate. Prison officials must
> engage in some sort of periodic review of the confinement of
> such inmates. This review will not necessarily require that
> prison officials permit the submission of any additional
> evidence or statements. The decision whether a prisoner
> remains a security risk will be based on facts relating to a
> particular prisoner—which will have been ascertained when
> determining to confine the inmate to administrative
> segregation—and on the official's general knowledge of prison
> conditions and tensions, which are singularly unsuited for
> "proof" in any highly structured manner. Likewise, the
> decision to continue confinement of an inmate pending
> investigation of misconduct charges depends upon
> circumstances that prison officials will be well-aware of—
> most typically, the progress of the investigation.

459 U.S. at 477 n. 9.

In *Toussaint*, the Ninth Circuit Court cited with approval two examples that square

with *Hewitt*. In *Mims v. Shapp*, 744 F.2d 946, 952 (3d Cir. 1984), the Third Circuit found

that monthly review of a prisoner's status satisfied due process concerns. *Toussaint*, 801

MEMORANDUM DECISION AND ORDER - 8

F.2d at 1101. In *Clark v. Brewer*, 776 F.2d 226, 234 (1985), the Eighth Circuit held that review every seven days for the first two months of segregation followed by regular review hearings every thirty days thereafter satisfied due process requirements. *Toussaint*, 801 F.2d at 1101.

The Court concludes that Plaintiff was given adequate due process when he was afforded a weekly meeting with a point-of-contact staff. Although Petitioner expressed he would like a change from the single-cell in the CC/PC housing unit *eventually*, the record does not reflect that he ever asked unequivocally asked for one. Nor did he ask for additional due process procedures in his weekly meetings. The process given comports with *Hewitt*, *Toussaint*, *Mims*, and *Clark*. Defendants are entitled to summary judgment on this subclaim of Claim 3.

## C. *Defendant's Argument that Defendants are Entitled to Qualified Immunity on Procedural Due Process Claim 3*

A motion for summary judgment on grounds of qualified immunity may be granted where the allegations on the face of the complaint, taken as true, are sufficient to show that the qualified immunity test is met. *See Cooper v. Pickett*, 137 F.3d 616, 622 (9th Cir. 1997). In § 1983 actions, the doctrine of qualified immunity protects state officials from personal liability for on-the-job conduct so long as the conduct is objectively reasonable and does not violate clearly established federal rights. *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982) (citations omitted). A qualified immunity analysis consists of two prongs: (1) whether the facts as alleged by plaintiff establish a violation of a constitutional right, and (2) whether that right was clearly established given the state of the law at the time of the

alleged misconduct. *Pearson v. Callahan*, 555 U.S. 223, 232 (2009) (citing *Saucier v. Katz*, 533 U.S. 194, 201 (2001)).

Courts may address either prong of the qualified immunity analysis first. *Pearson*, 555 U.S. at 236. The qualified immunity inquiry is "a pure question of law." *Elder v. Holloway*, 510 U.S. 510, 514 (1994). However, "under either prong, courts may not resolve genuine disputes of fact in favor of the party seeking summary judgment." *Tolan v. Cotton*, 572 U.S. 650, 656 (2014).

As to the first prong, the court considers whether, "[t]aken in the light most favorable to the party asserting the injury, . . . the facts alleged show the [defendant's] conduct violated a constitutional right." *Saucier*, 533 U.S. at 201. As to the second prong, a "case directly on point" is not necessary to show that the law was clearly established. Qualified immunity will not apply where existing precedent shows that "the statutory or constitutional question [is] beyond debate," *Ashcroft v. al–Kidd*, 563 U.S. 731, 741 (2011) (citation and punctuation omitted), and every reasonable official in the same circumstance would have understood "that his conduct was unlawful in the situation he confronted." *Saucier*, 533 U.S. at 202.

At the heart of the qualified immunity analysis is the substantive law governing the particular claims at issue, which the Court outlined above and further outlines below. A review of all factors Defendants had to consider in determining adequate housing for Plaintiff in light of existing case law and the unique facts of this case shows there is not a governing case that would have guided Defendants' determination. For the reasons that follow, the Court concludes that Defendants are entitled to qualified immunity on Claim 3.

The first questionable intersection of law and fact is that, if an inmate does *not* contest his housing placement and is given periodic one-on-one reviews to permit the inmate to raise any housing concerns, is any other process due? Under similar circumstances in another of Petitioner's cases, *Carr v. Higgins*, 700 F. App'x 598 (9th Cir. 2017), the Ninth Circuit Court held:

> The district court accurately observed that "there is no clearly established law that protective custody inmates must be afforded procedural due process rights when the prisoner has not contested his protective custody status." Indeed, Carr never sought to alter his protective custody status, and "a prisoner does not have a constitutional right to be housed at a particular institution, [or] to receive a particular security classification." *Neal v. Shimoda*, 131 F.3d 818, 828 (9th Cir. 1997) (citations omitted).

*Id*. at 601.

Another unique twist on the facts is that, not only did Plaintiff fail to ask to be moved from his single-cell arrangement, but he also repeatedly published his stance that double-celling in his unit, CC/PC, was dangerous. *See Carr v. Tewalt*, Case No. 1:21-cv-00409-BLW ("Case 409"), Dkt. 3 at 3. In Case 409, he sought an "Injunctive order forfeiting [the] Policy of Double-Celling Close Custody Inmates." Case 409, Dkt. 3 at 12. In *Carr v. Nye, et al.*, Case No. 1:22-cv-00332-JCC ("Case 332"), Plaintiff alleged: "Now, as far as for 'Constitutionally' … You can't Double-Cell Close Custody Inmates." Case 332, Dkt. 12 at 4 (ellipses in original).

Another issue for which existing case law had no ready resolution is  that Plaintiff was under back-to-back, overlapping, and repeated investigations for manipulating other inmates. For example, in *Carr v. Bartlett* ("Case 1:20-cv-491-REP, ("Case 491"),

Plaintiff's civil rights allegations about Ada County Sheriff's Office ("ACSO") investigators centered on a 2019 Prison Rape Elimination Act (PREA) letter Plaintiff had written to officials claiming that inmate James Davis had sexually assaulted him on October 14, 2018, and January 7, 2019, but he did not report either incident to prison officials when it occurred. Case 491, Dkt. 44 at 3-5 (sealed).

After the ACSO investigated these contentions, on September 19, 2019, ACSO investigators determined that there was a lack of corroborating evidence to support Plaintiff's claims. Case 491, Dkt. 84-5 at 2. The prosecutor declined prosecution. *Id*. Further, Judge Patricco determined on summary judgment that the claims against ACSO officials and investigators were legally and factually frivolous. Case 491, Dkt. 60 at 41. Plaintiff did not appeal the ruling.[2]

In addition, on March 27, 2020, during the time frame at issue, Plaintiff was issued a disciplinary offense report ("DOR") for having made false sexual assault allegations against inmate Davis; the DOR cited the ACSO investigation findings probed in Case 491. There was no clearly-established law instructing prison officials that keeping Plaintiff in isolation housing with monthly face-to-face reviews, with an investigation into serious misconduct, was contrary to law.

Yet another factor with no governing law in the due process context is that, during this same time frame, Plaintiff had been engaging in jailhouse lawyer activities that were

---

[2] Because the parties have not briefed a collateral estoppel issue, the Court cites Case 491, not for the truth of the matters determined there, but simply to show that Plaintiff was being investigated for serious misconduct during the time of his continued housing in D1.

deemed improper by the federal court, the state attorney general, and prison officials. Isolation appeared to be an appropriate solution to these problems. Plaintiff, in fact, filed suit on these issues in Case 332 including the issue of isolation as prison official's resolution to ongoing jailhouse lawyer problem. His case was dismissed with prejudice, with dismissal upheld on appeal. *See* Case 332.[3]

In Case 332, Plaintiff alleged that prison officials were violating his civil rights by isolating him from other prisoners to prevent him from conducting inappropriate jailhouse lawyer activities. United States District Judge John C. Coughenour dismissed the case with prejudice, concluding:

> Plaintiff has a documented history of attempting to encourage others to file lawsuits and/or filing lawsuits on their behalf that contain speculative and exaggerated claims. *See, e.g., Carr, et al., v. Tewalt, et al*., C21-0409-BLW, Dkt. No. 48 at 2–11 (D. Idaho 2022) (providing examples of previous cases where Plaintiff has interjected himself into another inmate's case). All the alleged actions in the proposed amended complaint appear to be reasonable restrictions put in place because of Plaintiff's past abuse of the legal process. Therefore, even if this Court were to accept Plaintiff's facts as true, the complaint contains no plausible claim for relief.

Case 332, Dkt. 13 at 2.

On appeal of Case 332, the United States Court of Appeals for the Ninth Circuit agreed that prison officials can take reasonable steps to curtail improper jailhouse lawyer activities:

---

[3] Again, this additional case is cited to show that Plaintiff was being investigated for yet another serious set of allegations, not for the truth of the matter determined in Case 332.

> The district court properly dismissed Carr's claims against the prison officials because Carr failed to allege facts sufficient to state a plausible claim. *See Hebbe v.* Pliler, 627 F.3d 338, 341-42 (9th Cir. 2010) (although pro se pleadings are construed liberally, a plaintiff must allege facts sufficient to state a plausible claim); *Crowe v. County of San Diego*, 608 F.3d 406, 440 (9th Cir. 2010) (setting forth the elements of a § 1983 conspiracy claim); *Rhodes v. Robinson*, 408 F.3d 559, 567-68 (9th Cir. 2005) (setting forth the elements of a First Amendment retaliation claim in the prison context); *see also Johnson v. Avery*, 393 U.S. 483, 490 (1969) ("[T]he State may impose reasonable restrictions and restraints upon the acknowledged propensity of prisoners to abuse both the giving and the seeking of assistance in the preparation of applications for relief . . . .").

Case 332, Dkt. 29 at 2.

For example, Plaintiff interfered in inmate Maximiliano Sileoni's case, allegedly charging him a jailhouse lawyer fee of "$60.00 dollar in his trust account and $40.00 dollar worth of woman photos and woman catalog." *Sileoni v. Corizon,* Case 1:19-cv-00427-BLW ("Case 427"), Dkt. 58 at 2.

In exchange for the jailhouse lawyer fees, Plaintiff filed the following documents for Sileoni, with the following outcome:

> In the Initial Review Order, the Court ordered the parties to limit their motions to three pending motions at a time. (Dkt. 6, p. 11.) Plaintiff now has nine pending motions, many of which are repetitive discovery motions asking for the same documents, filed in disregard of the Standard Disclosure and Discovery Order (Dkt. 8) issued by the Court in conjunction with the Initial Review Order. The Court will strike all of Plaintiff's motions with the exception of the two motions to amend and the motion to appoint counsel (Dkts. 23, 39, 51). Plaintiff is warned that if he continues to disregard Orders, the

Court will continue to strike his filings and may impose sanctions up to and including dismissal of his Complaint.

Plaintiff is using another prisoner to help prepare his legal documents, which is permissible. However, that prisoner's name should not appear in in Plaintiff's filings, such as asserting that the filings are being made "through" another prisoner, unless that prisoner is an Idaho-licensed attorney. Further, if the source of Plaintiff's frivolous motions—meaning motions that are without an adequate factual and/or legal basis—is his prisoner helper, Plaintiff may want to consider that the "help" is actually harming his case and his reputation as a litigant in this court.

Even before disclosures occurred, Plaintiff started down the abusive litigant path. The pending motions to amend, discussed more fully below, completely lacked factual support. The first motion requests frivolous remedies for the claim that he needs additional hernia surgery—including a protein shake from the prison kitchen every day, wire-framed glasses, and circumcision surgery. In his second motion to amend, Plaintiff seeks to replace his 9-page original Complaint with 143 pages of IDOC officials and employees who allegedly are making allegations about Plaintiff being an exhibitionist, plus 30 additional pages of miscellaneous allegations and requests, many of which do not rise to the level of a constitutional violation.

Beyond the frivolous filings—Plaintiff also has treated Defendants' counsel in a disrespectful manner. With no factual basis whatsoever, Plaintiff alleges by Affidavit (which means that it is a statement sworn to be true) that he should be appointed counsel because he is "handicapped in competing with trained and racist competent American counsel of the state." (Dkt. , p. 2.) Plaintiff shall refrain from making personal attacks that have no basis in fact, such as being "racist," in his court filings.

The Court has inherent power to "'regulate the activities of abusive litigants by imposing carefully tailored restrictions under the appropriate circumstances.'" *De Long v. Hennessey and Mansfield*, 912 F.2d 1144, 1147 (9th Cir. 1990) (quoting *Tripati v. Beaman*, 878 F.2d 351, 352 (10th Cir. 1989)). Because of Plaintiff's abusive litigation tactics—which make

> it exceedingly difficult to get to the heart of the matter, which is whether Plaintiff is being denied essential medical care—the Court will impose a case management plan that must be followed, or Plaintiff will suffer consequences that match the degree of his disobedience to court orders. Further abusive tactics and prohibited filings may be cause for sanctions, up to and including, striking of Plaintiff's motions or responses, or dismissing the Complaint with prejudice.

Case 427, Dkt. 56 at 2-3.

Other federal court cases that pinpointed Plaintiff as the origin of exaggerated and fabricated allegations, or as a nonparty who was inserting his own personal allegations into other inmates' pleadings include *Carr v. Tewalt*, Case 409, Dkt. 48 at 1-2; and *Nigro v. Tuckett*, Case 1:20-cv-00059-BLW ("Case 59"), Dkt. 25 at 3-5 (striking the amended complaint and ordering that inmate Shane Nigro could no longer seek aid from Carr with litigation documents intended for filing in federal court).

Adding the jailhouse lawyer issues to the mix of the reasons Plaintiff was continuously held in his regular housing unit, but in an isolation cell, fortifies the conclusion that there was no clearly-established case law existed governing the extent of due process rights in such a situation.

Further, when prison officials attempted to reduce Plaintiff's potentially-harmful jailhouse lawyer activities, he found a way to circumvent policies and procedures intended to promote safety and  order in the prison. Plaintiff was *supposed* to be isolated from contact with other inmates, but actually was not. Plaintiff was still able to draft or ask other inmates to draft for him detailed affidavits for his and others' litigations during his stay in D1. Plaintiff's evidence in this case and evidence from other cases includes the following:

MEMORANDUM DECISION AND ORDER - 16

The May 13, 2021, Ryan Cunningham affidavit in Case 409 states: The IDOC legal department/attorney general "is now dictating a policy of no visiting & no passing of papers on our unit/Tier D1, at ISCC under punishment if caught, because Carr was able to gather my/our collective affidavits/evidence and send it to the courts on or about 2-25-2021. That now, in order to do this legal work, we're held 100% unable to communicate, but Carr & I 'fish' under our cell doors with string & a staple & that's how I'll get this document into his possession."

Case 409, Dkt. 5-2 at 17.

Plaintiff's March 15, 2021, Amended Complaint in Case 332 states: "IDOC A.G.'s Office's Mark Kubinski began trying to STOP me from gathering Inmate Affidavits and Evidence, trying to STOP me from Filing, Mailing or Possessing Affidavits, Evidence, and/or helping other Inmates with Legal Matters. Kubinski had IDOC/ISCC Officials put out a "MEMO" on or about 3-15-21, stating (in part) "we will start enforcing these rules immediately for the dayroom," then, "#4. No crossing the redline/visiting," and, "#5. No passing items under the cell doors." Unit Staff and Paralegal Altig said the MEMO's orders came from the "IDOC Legal Department" i.e. Mark Kubinski. Then, another new Rule, Paralegals and Officers can no longer pass Affidavits to or from Inmates even for Cases with Case Numbers where they're Witnesses or Testifying. So, we "Fished" them, with Line under cell doors."

Case 332, Dkt. 2 at 6-7.

The April 30, 2021, Affidavit of Brandon Pierce in this case states: "I snuck [my affidavit] back to inmate Carr who gave it to his friend, inmate Sams in a manilla envelope."

Dkt. 80-3 at 121.

There is no case law governing what due process protections are due in a situation

MEMORANDUM DECISION AND ORDER - 17

where an inmate has been assigned an isolation cell to prevent his improper jailhouse lawyer activities, but he continues to have interactions with other inmates through illicit means.

Finally, Plaintiff's alleged right to be free from isolation was necessarily curtailed by the worldwide COVID pandemic, which occurred in the seventh month of the two-year time frame of isolation, and continued past the end of that period. Defendants are entitled to qualified immunity on the Eighth Amendment claim beginning in March 2020, when the COVID pandemic began,[4] and afterwards, because the official end of the pandemic was not until 2023.[5] In fact, a federal district court held that, during the COVID19 pandemic, California prison officials were required to do the most they could to isolate prisoners from one another, not the opposite, as Plaintiff contends. *See Sams v. California Dep't of Corr*., No. 521CV00493ODWJDE, 2023 WL 4291459, at *11 (C.D. Cal. May 30, 2023), *report and recommendation adopted sub nom. Sams v. California Dep't of Corr. & Rehab*., No. 521CV00493ODWJDE, 2023 WL 8702716 (C.D. Cal. Dec. 15, 2023).

In sum, during the time frame from August 27, 2019, through September 22, 2021, Defendants were called upon to craft a unique housing situation for Plaintiff that took into

---

[4] On March 11, 2020, the World Health Organization (WHO) declared COVID19, the disease caused by the SARS-CoV-2, a pandemic. *See* https://www.yalemedicine.org/news/covid-timeline (accessed March 29, 2025).

[5] On May 5, 2023, the World Health Organization declared the end of the worldwide COVID19 pandemic on May 5, 2023. *See* https://www.who.int/news/item/05-05-2023-statement-on-the-fifteenth-meeting-of-the-international-health-regulations-(2005)-emergency-committee-regarding-the-coronavirus-disease-(coviD19)-pandemic?adgroupsurvey=%7Badgroupsurvey%7D%26gclid=EAIaIQobChMI4O jtsdbe_gIVjQRyCh07igt4EAAYASACEgJ9pfD_BwE%26fbclid=IwAR2M8EAyiSrAodhK9p-X582nHkP2AigpSX8pYIsLsPwqYh4SG26RGokGe7E (accessed March 29, 2025).

consideration the foregoing factors, and there was little or no case law to guide them in the particulars of due process protections under the circumstances. In *Hewitt*, the Court observed: "The requirements imposed by the [Due Process] Clause are, of course, flexible and variable dependent upon the particular situation being examined….. Prison administrators ... should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." 459 U.S. at 472 (citations and punctuation omitted). Defendants are also entitled to summary judgment on qualified immunity grounds on Claim 3.

3. **Discussion of Claim 4: Conditions of Confinement from August 27, 2019, through September 19, 2021, as an Eighth Amendment Violation**

The Eighth Amendment to the United States Constitution, protecting prisoners from cruel and unusual punishment, has two components. First, a plaintiff must state facts showing that he is "incarcerated under conditions posing a substantial risk of serious harm," or that he has been deprived of "the minimal civilized measure of life's necessities" as a result of defendants' actions—which is analyzed under an objective standard. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994) (internal quotation marks omitted).

Second, a plaintiff must  bring forward facts showing that defendants were deliberately indifferent to his needs—analyzed under a subjective standard. The parties have not provided evidence regarding the subjective standard, and so the Court cannot analyze the Eighth Amendment analysis' second component.

**A.  *Privileges and General Living Conditions***

Defendants show that Plaintiff had access to most of the same privileges as other inmates in CC/PC, such as receiving medication, having the same standard-issue clothing, having the same amount of property as inmates in general population (six cubic feet), being permitted to practice religion, being able to purchase commissary items, having access to the telephone, kiosk, and visitors, and having time out of his cell to exercise and shower. Dkt. 83-1 at 11.

**B.  *Isolation***

As discussed above, Plaintiff asserts that he was placed in ISCC D1, cell # 4, in total isolation, on August 27, 2019. He also asserts that he was moved to isolation cell #5 in the same unit on September 5, 2019. In addition, prison officials allegedly placed a sign on Plaintiff's door instructing inmates that that they could not speak to Plaintiff or they would receive a DOR. Dkt. 57 at 10. For purposes of the summary judgment motions, the Court takes this allegation as true.

Because Plaintiff previously had been in isolation in the not-at-issue administrative segregation setting since July 19, 2021 (63 additional days), he asserts he spent a continuous period of  770 days in insolation. Dkt. 57 at 7. But elsewhere in this case, he asserts that he "rotted in isolation, *and Double-Celled Close Custody*" (Dkt. 73, p. 2, emphasis added), which seems to negate his allegations that he lived in isolation for the entire time period of which he complains.

In *Blandino v. Las Vegas Metro. Police Dep't*, No. 222CV00562GMNEJY, 2023 WL 5221543 (D. Nev. Aug. 15, 2023) (unpubl.), the court stated that "[s]olitary

confinement is not *per se* a violation of the Eighth Amendment, " but emphasized "there is a line where [its] conditions [can] become so severe that its use is converted from a viable prisoner disciplinary tool to cruel and unusual punishment. " *Id*.   at *5 (citations and punctuation omitted).

In 2019, the Fourth Circuit held that solitary confinement conditions on death row violated the Eighth Amendment. *Porter v. Clarke*, 923 F.3d 348 (4th Cir. 2019). Relying *Porter v. Clarke*, in 2020, the Third Circuit Court of Appeals held that prison officials who kept an inmate in solitary confinement on death row for 33 years were entitled to qualified immunity because "a single out-of-circuit case is insufficient to clearly establish a right"; but from that date "forward, it is well-established in our Circuit that such prolonged solitary confinement satisfies the objective prong of the Eighth Amendment test and may give rise to an Eighth Amendment claim, particularly where, as here, Defendants have failed to provide any meaningful penological justification." *Porter v. Pennsylvania Dep't of Corr.*, 974 F.3d 431, 451 (3d Cir. 2020) (citing *Porter v. Clarke*, 923 F.3d 348). See *also Thomasson v. Premo*, No. 6:14-CV-01788-MO, 2017 WL 2403565, at *3 n.1 (D. Or. June 2, 2017) ("The Court is aware of and "sensitive to research suggesting that the conditions to which inmates in solitary confinement are subjected often lead to profound psychological peril for the inmate, and as such, the use of solitary confinement itself may implicate an Eighth Amendment violation.").

The Court agrees with Defendants that, even if it was true that prison officials placed a sign on Plaintiff's door threatening any inmate with a disciplinary offense if he spoke to Plaintiff, the record clearly establishes that Plaintiff was able to carry on relationships,

conversations, and transactions with other inmates during his time in isolation. He was also provided with phone time and visiting time with family and friends. He had a one-on-one meeting with prison staff every week to discuss his conditions of confinement. Finally, he never unequivocally expressed a desire to leave his particular conditions of confinement. These factors weigh against a conclusion that Plaintiff's conditions were cruel and unusual.

### C. *Deprivation of Exercise and Out-of-Cell Time*

Plaintiff asserts that he received 45 minutes per day of out-of-cell time five days per week. Dkt. 79-4 at 1 (Plaintiff's Statement of Undisputed Facts). In other parts of the record, he asserts that his out-of-cell time was supposed to be one-hour per day, but about 30 to 40% of the time, the unit was on lockdown status, and he received no out-of-cell time. Dkt. 57 at 10. On days he was permitted out of his cell, he would get between 20 and one hour, and almost always 40 minutes. *Id*. at 8. Plaintiff asserts that the 40 minutes per day was not enough time to meet basic human needs, including showering, using the phone to call family or friends, using the kiosk to contact family and friends, using the law library, ordering commissary, participating in indoor or outdoor recreation and exercise, or using the microwave oven or laundry sinks. *Id*. at 8-10.

In addition, Plaintiff contracted dermatitis from not being able to shower after recreation. *Id*. at 11. On most days, Plaintiff was told that he could not go outside, but must recreate indoors only.

Affidavits from other inmates support Plaintiff's contention that his out-of-cell time was about 40 minutes a day:

MEMORANDUM DECISION AND ORDER - 22

> The November 26, 2020, Affidavit of Shawn Sheltra states:
> "[Carr] gets out about 45 minutes a day. He has to choose, to
> either go out to outdoor recreation or shower, or use the phone,
> or talk to other inmates thru their cell doors (which is forbidden
> by policy), or use the kiosk for contact with family and friends,
> or for library. He cannot complete combinations of these
> choices as 45 minutes can't possibly support "combinations"
> so if he goes outside and exercises … he can't shower
> afterwards."

Dkt. 80-3 at 124.

> The December 15, 2020, Lunde Justice Affidavit states: Carr
> "normally gets about 40 minutes every 24 hours" of
> dayroom/recreation time, and "it's been this way for a year."

Dkt. 80-3 at 98.

The lack of dayroom access alone, without an exercise component, does not rise to

the level of a constitutional deprivation, nor does it constitute an atypical or significant

hardship. *See, e.g., Arsberry v. Illinois,* 244 F.3d 558, 564 (7th Cir. 2001); *Postlewaite v.*

*Godinez*, No. 14-CV-501-JPG, 2014 WL 2892381, at *2 (S.D. Ill. June 26, 2014).

But "a single, identifiable human need such as food, warmth, or exercise" can

constitute a violation of the Eighth Amendment's prohibition on cruel and unusual

punishment. *Wilson v. Seiter*, 501 U.S. 294, 304 (1991). "[E]xercise is one of the most

basic human necessities protected by the Eighth Amendment." *Thomas v. Ponder*, 611 F.3d

1144, 1151–52 (9th Cir. 2010) "[T]he Constitution requires [prison] officials to provide

outdoor recreation opportunities, or otherwise meaningful recreation, to prison inmates."

*Norbert v. City & Cnty. of San Francisco*, 10 F.4th 918, 931 (9th Cir. 2021) (citation

omitted).

There is no constitutional right to *outdoor* exercise, nor is there any law showing

that it is cruel and unusual punishment for prison officials to require prisoners to choose how to use their out-of-cell time: in *Norbert*, the Court emphasized that it has never held that "the Eighth or Fourteenth Amendments categorically required exercise to take place outdoors regardless of any indoor recreation options." *Id*. Nor is there a "bright-line" rule setting forth the amount of time or circumstances under which prisoners may be denied out-of-cell exercise before the deprivation is considered "sufficiently serious" to invoke Eighth Amendment protection.

The Ninth Circuit has consistently held the "long-term" denial of exercise may violate the Eighth Amendment. *See Lopez v. Smith,* 203 F.3d 1122, 1132–33 (9th Cir. 2000) (en banc) (holding a 6 1/2 week denial sufficient to satisfy the objective component of an Eighth Amendment violation); *Keenan v. Hall,* 83 F.3d 1083, 1089 (9th Cir. 1996), *as amended* 135 F.3d 1318 (9th Cir.1998) (finding triable issues of fact regarding a complete six–month deprivation of out-of-cell exercise).

During the pre-COVID time period from August 2019 through February 2020, a time frame of a little more than six months, the record reflects that Plaintiff was provided with exercise time of about 45 minutes per week for fives days a week or 40 minutes a day for 60 to 70% of each week. Dkt. 57 at 8. There are no allegations that Plaintiff missed extended periods of out-of-cell-time or exercise during this six-month period. Most case law focuses on loss of exercise time for an extended period of time. *See LeMaire v. Maass*, 12 F.3d 1444, 1457-58 (9th Cir. 1993) (where the inmate was deprived of exercise for "most of a five-year period," he met the objectively serious prong of the Eighth Amendment test, because "this circuit has determined the long-term denial of outside

exercise is unconstitutional"); *Spain v. Procunier*, 600 F.2d 189, 200 (9th Cir. 1979) (holding that exercise was required for prisoners confined to segregation for disciplinary purposes for longer than four years). *Norwood v. Woodford*, 583 F. Supp. 2d 1200, 1204 (S.D. Cal. 2008) (a denial of all outdoor exercise for 39 days meets the objective prong). *Hayward v. Procunier*, 629 F.2d 599, 603 (9th Cir. 1980) (extended lockdown five-month lockdown causing a complete deprivation of outdoor exercise in response to a genuine emergency did not satisfy the objective element of the Eighth Amendment analysis).

Cases analyzing instances where prisoners were allowed regular moderate periods of exercise do not support Plaintiff's contention that his exercise time equaled cruel and unusual punishment. In *Nelson v. CA Dept of Corr.*, No. C 02-5476 SI(PR), 2004 WL 569529, at *4 (N.D. Cal. Mar. 18, 2004), *aff'd sub nom. Nelson v. Lamarque*, 131 F. App'x 549 (9th Cir. 2005), the Court held that "six hours of outdoor exercise per week for five months, as a matter of law, does not amount to cruel and unusual punishment. There was no long-term denial of outdoor exercise.").

In *Lopez*, the prisoner alleged that during a six-week period he had been allowed only 45 minutes of outdoor exercise *per week*. 203 F.3d at 1133. The Ninth Circuit Court held that the prisoner "has met the objective requirement of the Eighth Amendment analysis by alleging the deprivation of what this court has defined as a basic human need." In comparison, Plaintiff's claim that he received 45 minutes a day for five days a week or 40 minutes daily for 60 to 70% of the week is far from the 45 minutes *per week* found unacceptable in *Lopez*.

Plaintiff's allegations are closer to *Nelson* than to *Lopez*. The pre-COVID exercise

time frame did not amount to cruel and unusual punishment. The Court takes judicial notice that the United States Department of Health and Human Services guidelines are not far afield from the time afforded Plaintiff.[6] If he chose to exercise vigorously for 20 minutes, shower for 10 minutes, and take care of other business for 10 minutes, he could have avoided dermatitis from not showering and yet still have exercised an adequate amount of time. In addition, he could have supplemented by exercising in his cell before his out-of-cell time, thus, extending his exercise and showering window.

The Court concludes that Plaintiff has provided insufficient facts to show that he was deprived of the right to exercise during the time frame from mid-August 2019 to February 2020, a period of a little over six months. Before the pandemic started.

### D. *Impact of COVID19 Pandemic*

When the COVID19 pandemic began in March 2020, "conditions of confinement were occasionally modified in response…, which necessitated measures to keep staff and inmates safe." Dkt. 83-1 at 11-12. Plaintiff was in safer housing alone than he would have been housed if he were housed with another inmate or if he had additional out-of-cell time in an area used by other inmates. Non-incarcerated individuals were quarantined or

---

[6] The United States Department of Health and Human Services recommends:

> For substantial health benefits, adults should do at least 150 minutes (2 hours and 30 minutes) to 300 minutes (5 hours) a week of moderate-intensity, or 75 minutes (1 hour and 15 minutes) to 150 minutes (2 hours and 30 minutes) a week of vigorous-intensity aerobic physical activity, or an equivalent combination of moderate- and vigorous-intensity aerobic activity. Preferably, aerobic activity should be spread throughout the week.

*See* chrome-extension://efaidnbmnnnibpcajpcglclefindmkaj/https://odphp.health.gov/sites/default/files/2019-10/PAG_ExecutiveSummary.pdf (accessed 3/29/2025).

sheltered-in-place during COVID19 both for personal safety and to lessen the risk of spreading the disease if they had contracted it; health clubs and gyms were closed, requiring individuals to exercise at home. That Plaintiff had equivalent circumstances in prison does not amount to cruel and unusual punishment during a rare and extreme worldwide pandemic. As noted above, prison officials were required to do their best to socially-distance inmates during the pandemic, not vice versa.

Having reviewed the record, the Court has determined that Defendants are entitled to qualified immunity on the Eighth Amendment claim beginning in March 2020, when the COVID pandemic occurred, and afterwards, because the official end of the pandemic was not until 2023. Officials had little to guide them in deciding when to resume regular out-of-cell time after a pandemic. In *Noble v. Adams*, where a lack of outdoor exercise claim was asserted after another type of life-threatening situation, the Court granted qualified immunity to prison officials, reasoning that "it was not clearly established in 2002—nor is it established yet—precisely how, according to the Constitution, or when a prison facility housing problem inmates must return to normal operations, including outside exercise, during and after a state of emergency called in response to a major riot, here one in which inmates attempted to murder staff." 646 F.3d 1138, 1143 (9th Cir. 2011). As in *Noble*, Idaho prison officials had never encountered a worldwide pandemic before; therefore, they had no clearly-established law governing when to return to regularity afterward. The pandemic did not officially end until 2023—beyond the time period of Petitioner's claim. Defendants are entitled to qualified immunity for post-COVID claims of inadequate out-of-cell time and exercise.

MEMORANDUM DECISION AND ORDER - 27

### 4. Discussion of Claim 5

Claim 5 is that, between May 2019 through June 2019, prison officials violated Plaintiff's civil rights by intimidating witnesses Robert Lagrotta, James Barber, Maximiliano Sileoni, and others during a disciplinary investigation of Plaintiff after inmate Wolfe disclosed to authorities that Plaintiff solicited another inmate to assault Plaintiff. Dkt. 57, p. 13. Plaintiff more recently provided the Affidavit of inmate Thomas Hooley, who states he is a witness for Plaintiff, and that IDOC officials threatened him, attempted to bribe him, requested that he write a false statement against Plaintiff, and threatened him with punishment if he submitted an affidavit in favor of Plaintiff. Dkt. 69-1 at 1. Dkt. 80-3 at 113.

Earlier in this case, the Court notified Plaintiff that the threshold question is whether Defendants had an independent constitutional duty to him in conducting their prison investigation, or whether his claims arising from a prison investigation are derivative of a procedural due process claim that exist *only* if Plaintiff can show that he had a state-created liberty interest in avoiding the discipline he received in the hearing that relied on the prison investigation. In Case 315, the Court determined that Plaintiff received only light sanctions from prison officials' findings that he made false allegations about being sexually assaulted by inmate James Davis (20 days of commissary restrictions and 10 days of recreation restriction. *See* Case 315, Dkt. 20 at 1). No liberty interest arose from these light sanctions. Hence, no process was due.

Defendants report they could find no case law supporting Plaintiff's position. Plaintiff generally cites *Burnsworth v. Gunderson*, 179 F.3d 771 (9th Cir. 1999), as

MEMORANDUM DECISION AND ORDER - 28

authority that a liberty interest analysis is not always necessary to state a due process claim. *See* Dkt. 88. *Burthsworth* held: "An exception allowing a prisoner to pursue a procedural due process claim without showing a liberty interest may apply if prison officials have found a prisoner guilty of a disciplinary infraction at a hearing where "no shred of evidence of the inmate's guilt is presented." *Id*. at 775.

Courts have questioned "*Burnsworth*'s continuing viability in light of *Swarthout v. Cooke*, 562 U.S. 216, 219 (2011), "which held that a due process interest in parole-related issues exists only when a state-created liberty interest also exists." *Pitts v. Espinda*, No. CV 15-00483 JMS/KJM, 2016 WL 11696326, at *5 n.5 (D. Haw. July 21, 2016); *See Stanley v. St. Paul*, 773 F. Supp. 2d 926, 929 (D. Idaho 2011) (questioning *Burnsworth*'s applicability after *Swarthout*); *Smith v. Powell*, No. 2:14-CV-01725-SB, 2016 WL 1183086, at *2 (D. Or. Mar. 28, 2016), *aff'd*, 693 F. App'x 610 (9th Cir. 2017).

*Swarthout* reiterated the critical sequence of a due process analysis: "We first ask whether there exists a liberty or property interest of which a person has been deprived, and if so we ask whether the procedures followed by the State were constitutionally sufficient." 562 U.S. at 219. In *Swarthout*, because there was no liberty interest in parole, "[t]hat should have been the beginning and the end of the federal habeas courts' inquiry into whether Cooke and Clay received due process." *Id.* at 220.

Especially supporting a conclusion that *Burnsworth* is no longer good law was *Swarthout*'s explanation that: "[t]he Ninth Circuit's questionable finding that there was no evidence in the record supporting the parole denials *is irrelevant* unless there is a federal right at stake, as § 2254(a) requires." *Id*. at 222 (emphasis added). Here, this Court

MEMORANDUM DECISION AND ORDER - 29

concludes that any duty to an inmate as to the manner in which prison officials conducted a prison investigation is derivative of a procedural due process claim; therefore no claim exists unless a plaintiff first can show that he had a state-created liberty interest in avoiding the discipline he received related to the prison investigation-based disciplinary decision findings. The Constitution is concerned only about circumstances serious enough to rise to the level of a liberty interest. Without a due process interest in the outcome of a disciplinary offense, it is irrelevant that officers allegedly intimidated witnesses.

Another reason Plaintiff has failed to state a viable due process claim is that the allegedly tainted investigation did not lead to criminal charges, which would have triggered constitutional protections against malicious prosecution. *See, e.g., Vann v. Oklahoma State Bureau of Investigation*, 28 F. App'x 861 (10th Cir. 2001) (holding that the complaint asserting a claim for denial of parole based on prison officials' "false documentation," slander, irreparable injury to reputation, conspiracy, "imparting or conveying false information," and "false records and reports" failed to state a federal claim upon which relief can be granted for lack of a foundational showing of a liberty interest in parole).

For the foregoing reasons, the Court will dismiss Claim 5 with prejudice for failure to state a claim upon which relief can be granted.

## ORDER

**IT IS ORDERED:**

1. Plaintiff's Motion for Partial Summary Judgment (Dkt. 79) is DENIED

2. Defendants' Cross-Motion for Summary Judgment (Dkt. 83) is GRANTED.

3. Plaintiff's Motion to Submit/Resubmit Exhibits (Dkt. 80) is GRANTED.

4. Defendants' Sealed Motion for In Camera Review (Dkt 84) is GRANTED.

DATED: March 31, 2025

David C. Nye
Chief U.S. District Court Judge